**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

REJEANNE M. BERNIER, and HANS S.
CROTEAU
     *Plaintiffs*,

    v.

TRAVELERS PROPERTY CAUSALTY
INSURANCE COMPANY
    *Defendant*.

No. 3:24-cv-1061 (VAB)

## RULING AND ORDER ON MOTION TO DISMISS

Rejeanne M. Bernier ("Ms. Bernier") and Hans S. Croteau ("Mr. Croteau") (collectively, "the Plaintiffs") have sued Travelers Property Casualty Insurance Company ("Travelers" or "the Defendant") for claims of: (1) civil conspiracy in violation of 42 U.S.C. § 1983 in furtherance of retaliation under the First Amendment, deprivation of due process under the Fourteenth Amendment, and discrimination under the Equal Protection Clause of the Fourteenth Amendment; and (2) civil conspiracy under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), in furtherance of retaliation under the First Amendment. Amd. Compl., ECF No. 29 at 22–32 (Oct. 29, 2024) ("Amd. Compl.").

Travelers has filed a motion to dismiss the Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted, Mot. to Dismiss, ECF No. 30 (Nov. 12, 2024), and their memorandum in support of their motion to dismiss. Mem. in Support of Mot. to Dismiss, ECF No. 30-1 (Nov. 12, 2024) ("Mot.").

1

Mot. to Dismiss, ECF No. 30-1 (Nov. 12, 2024) ("Mot.").

For the following reasons, the Complaint is **DISMISSED**, and Defendants' motion to dismiss is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Allegations[1]

Bernier's "Property" was allegedly covered by an all-risk homeowner's insurance Policy (the "Policy") allegedly issued by Travelers for 2006 – 2007, when Bernier allegedly orally agreed with a third party, Jessie Croteau, Bernier's eldest son, to remodel the Property. Amd. Compl. ¶ 14.

Jessie Croteau allegedly removed the Property's main roof. *Id.* ¶ 15. On August 26, 2007, it allegedly rained. *Id.* The Plaintiffs allegedly notified Travelers. Travelers allegedly opened claim number UMZ7908 and then notified Jessie Croteau of this claim. *Id.*

On September 5, 2007, Jessie Croteau allegedly disputed with Bernier his liability for damages caused by the rain. *Id.* ¶ 16. On an audio recording, Jessie Croteau allegedly admitted that there was no written contract. *Id.* Afraid allegedly of his liability, Jessie Croteau allegedly pressured Bernier to sign a release of liability, but she allegedly refused. *Id.* Jessie Croteau then allegedly abandoned the Property without a main roof, exterior walls, doors and windows. *Id.* ¶ 17. Bernier allegedly told Travelers about this recording, but Travelers allegedly failed to act on it. *Id.*

Travelers then allegedly failed to disclose to Bernier that Jessie Croteau had claimed a written contract existed, despite the fact that Bernier allegedly told Travelers that only an oral

---

[1] For purposes of this motion to dismiss, the Court considers the factual allegations from the Complaint to be true.

2

contract existed. Travelers' also, allegedly ignored his involvement in a related lawsuit from a

pool company (the "South Coast" case), and the condition of Bernier's Property, and allegedly

failed to subrogate her claim to his liability insurance, United Contractors Insurance Company

("UCIC") and to inform Bernier that Mr. Croteau and his alter ego construction entity, I.C.S.

Professional Services, Inc. ("ICS"), had liability insurance with UCIC despite its alleged

knowledge that UCIC existed. *Id.* ¶ 18.

On October 1, 2007, in a California state court, Ms. Bernier allegedly filed suit against

Jessie Croteau and ICS for breach of oral contract. *Id.* ¶ 19. ICS allegedly filed a cross complaint

for breach of written contract based on fabrications containing forgeries of Bernier's signature,

hereinafter the "Construction Case". *Id.*

On October 16, 2007, the Presiding Judge of the San Diego Superior Court, State of

California, Kenneth So, allegedly entered a "prefiling order" directed at both Plaintiffs. *Id.* ¶ 20.

The prefiling order was allegedly not in due course and allegedly entered in clear absence of all

jurisdiction because, *id.*:

- The "authority and duties" of a Presiding Judge pursuant to California Rule of Court

  10.603 allegedly do not authorize entry of a prefiling order, a duty of the trial judge,

  *id.*;

- The prefiling order is allegedly "unsupported". *Id.* The "attorney or party without

  attorney" who allegedly submitted the prefiling order "pursuant to a motion made by

  Millerd Universal Enterprises" is allegedly conspicuously missing from the prefiling

  order, *id.*;

- The prefiling order is allegedly baseless. There's allegedly "no order or granted

  request for a prefiling order under Cal. Civ. Pro. Section 391.7(a)" in the M.U.E. trial

judge's file, *id.*;

- Millerd Universal Enterprises "M.U.E." and its attorney allegedly deny any and all involvement with the prefiling order, *id.*;

- Judge So allegedly did not provide either Plaintiff with due process notice that the prefiling order would be entered, *id.*;

- Judge So allegedly did not provide either Plaintiff with an opportunity to be heard in opposition to the entry of the prefiling order dated October 16, 2007, *id.*;

- Despite Plaintiffs' address allegedly being on the face of the prefiling order, Judge So allegedly deterred a direct appeal by not notifying Plaintiffs by U.S. mail after its entry, *id.*;

- No person or entity has allegedly ever taken responsibility for the submission of the prefiling order to the Presiding Judge of the San Diego Superior Court, *id.*; and,

- Jessie Croteau's attorney allegedly was also Plaintiffs' attorney in the M.U.E. case. The M.U.E. case was allegedly unrelated to the Construction Case and resolved or dismissed five years prior. *Id.*

The order allegedly states "[t]his prefiling order is entered pursuant to a motion made by" M.U.E. *Id.* ¶ 21. This was allegedly false, *id.*, and whoever allegedly submitted false information to encourage its entry, allegedly acted with the intention of influencing subsequent litigation. *Id.*

On September 20, 2007, Jessie Croteau allegedly wrote to Bernier that the courts were aware that she had been "branded" as a vexatious litigant and would thus be held to a "higher standard". *Id.* ¶ 22.

On September 24, 2007, allegedly in an effort to coerce the City of San Diego to act in his favor, Jessie Croteau allegedly accused the Plaintiffs of fraud against Travelers and their

4

utilities provider, that they were vexatious, that Hans Croteau had two (2) criminal cases, that Bernier had refused to sign the release of liability and that South Coast was suing the Plaintiffs. *Id.* ¶ 23.

On October 17, 2007, Jessie Croteau allegedly falsely told Travelers that Bernier had been "branded" as vexatious and he allegedly demanded that, accordingly, Travelers take his side in the Construction Case in furtherance of the objective of the conspiracy. *Id.* ¶ 24.

In alleged violation of California Code of Regulations § 2695.4(a), Travelers then allegedly concealed its duty to inform Bernier of these material facts and associated Policy benefits. *Id.* ¶ 25.

Bernier allegedly had not been "branded" vexatious. *Id.* ¶ 26. In March 2008, during mediation, South Coast allegedly also argued that Bernier had been "branded" vexatious. Based thereon, South Coast allegedly rejected Bernier's offer to settle and allegedly conspired with Jessie Croteau to have him testify at trial. *Id.*

On June 24, 2008, Croteau, ICS and Attorney Thomas F. Olsen allegedly lodged ICS' forged contract and the prefiling order with the court in support of a motion to have Bernier post a $100,000 bond to maintain the Construction Case. *Id.* ¶ 27. Jessie Croteau, ICS and Olsen allegedly ultimately influenced the court into dismissing the Construction Case without substantive due process. *Id.*

On July 7, 2008, Bernier allegedly informed Judge So that his entry of the prefiling order had been unsupported and Bernier allegedly demanded that the prefiling order be investigated in order "to prevent this fraud from being perpetuated upon this Court." *Id.* ¶ 28.

In July 2008, Bernier allegedly complained to the County of San Diego Sheriff about ICS's forged contract. *Id.* ¶ 29. The Sheriff allegedly told Bernier that she would have to wait

until the court decides the pending motion on July 25, 2008, in which ICS's forged contract had been lodged. *Id.*

On July 11, 2008, Judge So allegedly found the prefiling order had "no basis". *Id.* ¶ 30. Judge So allegedly found that it had been "entered in error" and he allegedly entered an order to strike the baseless order. *Id.* Although Judge So allegedly entered an order to strike, Judge So allegedly did not address all his related procedural errors, nor identify the party who had submitted the baseless order to him. *Id.* ¶ 31.

On July 25, 2008, the California court allegedly denied the motion to have Bernier post a bond and allegedly nevertheless found that the baseless order had been "vacated as unsupported." *Id.* ¶ 32. On December 12, 2008, Bernier allegedly complained again about ICS's forged contract to the Sheriff. Sheriff David Hale allegedly confiscated copies of ICS's forged contract from Bernier. *Id.* ¶ 33.

On or about February 27, 2009, Attorney Olsen allegedly refused to release the originals of ICS's forged contract to the San Diego County Sheriff. *Id.* ¶ 34.

At the trials of both the South Coast and Construction Cases, Jessie Croteau had allegedly falsely accused Bernier of insurance fraud against Travelers fraud against her utilities provider, drug abuse, that Hans was suing Jessie, and that Bernier habitually sues contractors. *Id.* ¶ 35.

The allegedly baseless order had allegedly influenced Judge Nevitt's handling of the Construction Case, particularly his allowance of extensive "state of mind" testimony from Bernier, despite repeated objections to its relevance. *Id.* ¶ 36. Judge Nevitt allegedly appeared to be influenced by the vexatious litigant label, as he encouraged the case to settle on April 9, 2009, and expressed frustration with its length, stating that "one side, or perhaps both, will be disappointed in the result." *Id.*

6

On April 14, 2009, despite the court's alleged prior finding that the baseless order had been vacated as unsupported, Judge Nevitt allegedly found that "it's been established that she is a vexatious litigant, or at least as of October 16, 2007." *Id.* ¶ 37.

On April 23, 2009, Judge Nevitt allegedly informed "the parties of an unsolicited and unexpected ex parte communication" by Sheriff's Detective David Hale. Detective Hale had allegedly asked Judge Nevitt "what the proper procedure was to obtain" ICS's contracts from his chambers. Instead of answering, Judge Nevitt allegedly directed the Detective to the District Attorney. *Id.* ¶ 38.

After April 23, 2009, Sheriff's Detective David Hale allegedly informed Hans that Deputy District Attorney Paul Greenwood said that he would "not touch this case with a ten foot pole." *Id.* ¶ 39.

On June 2, 2009, Judge Nevitt allegedly concluded that he had been "left to guess" what the actual arrangement between the parties for remodeling the Property had been. Despite allegedly considering Bernier's testimony, which he allegedly weighed against ICS's forged contract and the baseless prefiling order, he allegedly entered judgment in favor of the defense and cross-defense. *Id.* ¶ 40.

Judge Nevitt's alleged bias is allegedly evident by the threshold nature of his ruling, which allegedly stated: "Neither side established any cause of action. It is undisputed that there was some arrangement that caused remodeling work to be done at Ms. Bernier's house, but neither side established what that arrangement was." *Id.* ¶ 41. The judgment allegedly further noted that both Bernier and Jessie had not been credible and their accounts conflicted, leaving Judge Nevitt to "guess what the true arrangement was." *Id.* Bernier allegedly had experts. *Id.* Jessie allegedly had no experts. *Id.* Judge Nevitt's decision not to grant Bernier a judgment

allegedly set the foundation for Jessie's subsequent malicious prosecution claims. *Id.* This ruling also allegedly contributed to further adverse outcomes in later cases, as other judges were allegedly influenced by the vexatious litigant label. *Id.* The result of the Construction Case allegedly became a cornerstone for years of ongoing litigation, judicial bias and deprivation of Plaintiffs' constitutional rights and access to the courts. *Id.*

On July 24, 2009, Deputy District Attorney Greenwood allegedly told the court that he had recently received the file and the court's tentative to hold ICS's contracts fits in with his timeline. *Id.* ¶ 42. Out of court, he allegedly greeted Plaintiffs with the phrase "vexatious canucks" and walked away. *Id.*

On August 27, 2009, the court allegedly found that "reportedly the Sheriff's Department feels obliged to wait" until a motion to tax costs on September 18, 2009, "before it acts". *Id.* ¶ 43.

On September 29, 2009, Deputy District Attorney Greenwood allegedly told Bernier's attorney that Hans was an essential witness and because Hans was a vexatious litigant he would lack credibility. *Id.* ¶ 44.

Neither Judge So nor Deputy District Attorney Greenwood allegedly had investigated who had presented the prefiling order to the court. *Id.* ¶ 45. The allegedly baseless order allegedly influenced all court proceedings and allegedly deprived the Plaintiffs of their constitutional rights to fair hearings, thus allegedly constituting fraud on the court. *Id.*

Hans Croteau had allegedly sued Jessie Croteau and ICS on August 19, 2008, for Hans Croteau's allegedly unpaid labor on the remodeling project of Bernier's Property, hereinafter the "Employment Case". *Id.* ¶ 46.

On September 22, 2008, Jessie Croteau, ICS and Olsen had allegedly lodged the

allegedly baseless order in the Employment Case in order to influence the court and outcome of the Employment Case. *Id.* ¶ 47.

On February 24, 2010, Jessie Croteau alleged (1) "a multitude of criminal charges" by DDA Greenwood "against Mr. Hans S. Croteau", (2) Jessie allegedly denied that there was a "criminal investigation by the Sheriff' Department of ICS or Jessie G. Croteau" and (3) Jessie allegedly admitted to having "contacted and referred this matter to the D.A. as far back as of July 2008." *Id.* ¶ 48.

These allegations were allegedly part of Jessie Croteau's motion urging the court to contact Deputy District Attorney Paul Greenwood and Sergeant Mark Varnau (who had declared that the Sheriff felt "obliged to wait") in order "to confirm their intentions to pursue Mr. Hans S. Croteau criminally." *Id.* ¶ 49.

On May 6, 2010, the court allegedly found that the "odd" judgment in the Construction Case had rendered Hans Croteau' claims in the Employment Case now "impossible to determine". *Id.* ¶ 50.

On May 11, 2010, Deputy District Attorney Paul Greenwood allegedly cleared Jessie Croteau of the forgery charges in writing. *Id.* ¶ 51. He also alleged said that "there have been other matters relating to your brother and mother that have also been occupying my attention." *Id.*

On May 25, 2010, Jessie Croteau allegedly wrote to Judge Oberholtzer and allegedly urged him to expedite his decision in the Employment Case so he allegedly could use it to quash a claim in another matter. *Id.* ¶ 52. His letter was allegedly derogatory. *Id.* He allegedly implied that a protective or restraining order should be entered to prevent more lawsuits. *Id.* Jessie allegedly referred to Judge So's order. *Id.* He allegedly did not serve it upon Hans Croteau. *Id.*

The outcomes of the South Coast, Construction and Employment Cases allegedly were the result of a coordinated effort by Jessie Croteau, Travelers and state actors to deprive Plaintiffs of their rights. *Id.* ¶ 53. Judge So's allegedly baseless order and his allegedly ineffective order to strike allegedly laid the groundwork for these outcomes which allegedly violated Plaintiffs' constitutional rights by preventing their redress of grievances. *Id.*

Judge Nevitt allegedly warned that he would not "hold onto these exhibits indefinitely" but Greenwood allegedly did not obtain them. *Id.* ¶ 54. So, Bernier's expert allegedly examined them in his chambers. *Id.* The age of the paper allegedly predated the start of the project, allegedly evincing Jessie Croteau's intentions for undertaking the project. *Id.* Plaintiffs allegedly asked Travelers to reopen claim UMZ7908 to claim additional benefits. *Id.*

Instead, Travelers allegedly assigned claim HAY7166 and allegedly denied the claim because "the request to reopen the original claim was reported more than one year" after it was closed. *Id.* ¶ 55.

Without allegedly explaining its communications with Jessie Croteau in 2007, Travelers allegedly claimed it had investigated the claims and Jessie Croteau/ICS' activities did not constitute malicious mischief. *Id.* ¶ 56.

On October 29, 2010, Bernier allegedly sued Travelers for breach of contract (Policy duty to pay a covered claim), bad faith and breach of contractual confidentiality. *Id.* ¶ 57. That third cause of action alleged Travelers had shared Bernier's confidential insurance file with Jessie Croteau. *Id.*

On September 10, 2007, Jessie Croteau allegedly had promised that he would provide a copy of "the contract" to Travelers. *Id.* ¶ 58. But Jessie Croteau allegedly had no written contract for the remodeling. *Id.* Travelers allegedly owed Bernier a duty to compel Jessie Croteau to

reveal his false contracts at that time so it could do its own examination. *Id.* Instead, it allegedly gave him access to Bernier's file. *Id.*

Based on Bernier's file, Jessie Croteau allegedly falsely accused her of fraud in the South Coast case. *Id.* ¶ 59. He allegedly undermined her credibility with those lies and its outcome in the Construction Case. *Id.*

This allegedly unauthorized disclosure had allegedly violated California Insurance Code § 791.13 and directly contributed to his ability to taint the outcomes of the South Coast and Construction Cases. *Id.* ¶ 60.

Jessie Croteau allegedly had relied on Travelers' misunderstanding in Bernier's confidential file to falsely allege that Hans had impersonated legal counsel in order to obtain privileged documents in support of Jessie Croteau's false criminal allegations to Deputy District Attorney Greenwood and Deputy Attorney General Michael German. *Id.* ¶ 61. Hans Croteau allegedly had called Travelers from an attorney's office specializing in construction law. *Id.* Hans Croteau allegedly did not claim to be "the contractor's attorney." *Id.*

Jessie Croteau, or persons under his control, are now allegedly presumed to have impersonated Hans Croteau in calls to both Mr. Klone of UCIC and Deputy Attorney General German, allegedly falsely representing themselves as Hans Croteau and Jessie Croteau to manipulate state actors and UCIC into furthering Jessie's objectives. *Id.* ¶ 62.

On January 27, 2012, the California Department of Justice, on behalf of Bernier's third party deponent, Paul Bardos as expert consultant for the Contractor's State License Board "CSLB", allegedly moved to stay Bernier's subpoena directed at Expert Consultant Paul Bardos. *Id.* ¶ 63.

Jessie Croteau allegedly manipulated Deputy Attorney General German to mislead the

court due to Greenwood's actions, the outcomes of the Construction and Employment Cases and Jessie Croteau's slurs of vexatiousness. *Id.* ¶ 64. Jessie Croteau allegedly relied on Greenwood to further discredit the Plaintiffs. *Id.* Clothed allegedly with authority of the California Department of Justice, German allegedly furthered the conspiracy's objective. *Id.*

Deputy Attorney General Michael German allegedly informed Magistrate Brooks that Expert Consultant Paul Bardos' "sole contact with any member of Plaintiff's family stems from his serving as the expert consultant in the administrative law case where Plaintiff's son was cited for work improperly performed on a property not owned by Plaintiff or having any relation to her or her claims in this action." *Id.* ¶ 65. In fact, Paul Bardos allegedly had inspected Bernier's Property on September 7, 2010. *Id.* ¶ 66.

In March 2010, Bernier allegedly had filed a consumer complaint with the CSLB. *Id.* ¶ 67. Jessie Croteau and ICS's attorney, Patrick Howe, allegedly had written to the CSLB on April 14, 2010, warning it that Bernier had been "filing excessive lawsuits in San Diego." *Id.*

On January 30, 2012, Magistrate Brooks allegedly stayed the deposition of Paul Bardos. *Id.* ¶ 68.

On February 3, 2012, Travelers allegedly admitted that Bernier was seeking audio recordings which Travelers "was not able to locate". *Id.* ¶ 69. Travelers allegedly had "agreed to search again", but instead, Travelers allegedly filed a motion for summary judgment on February 28, 2012. *Id.* In its motion for summary judgment, Travelers allegedly argued Bernier had violated the Suit Against Us condition and her suit was barred by her violation of the notice condition in the Policy that she inform Travelers of the occurrence of the loss "as swiftly as possible." *Id.* ¶ 70.

Bernier allegedly notified Travelers of the loss on the day it rained. *Id.* ¶ 71. Travelers

allegedly learned of Jessie Croteau's true intentions for undertaking the remodeling in 2007 directly from Jessie Croteau. *Id.* Instead of reopening UMZ7908, Travelers allegedly assigned HAY7166 and argued that she waited too long. *Id.*

Travelers' HAY7166 claim notes allegedly establish that it referred her claim to its investigations unit under its pretense that she had submitted questionable documentation. *Id.* ¶ 72.

On March 16, 2012, Jessie Croteau allegedly moved to intervene in the Malicious Mischief Case. *Id.* ¶ 73. An attorney, Patrick Howe, allegedly declared that Bernier had complained to the CSLB, that the CSLB "hired Mr. Bardos to inspect the property and prepare a written report," and the CSLB issued a citation against ICS which the CSLB immediately withdrew after Bernier noticed Bardos' deposition. *Id.*

Travelers' motion for summary judgment allegedly resulted in a dismissal, allegedly depriving Bernier of the opportunity for substantive judicial review. *Id.* ¶ 74. The court allegedly granted its motion based on the timing of claim HAY7166 and not whether Jessie's activities were malicious mischief. *Id.*

In response to Bernier's discovery in the Construction Case, ICS allegedly had testified under oath that ICS did not have liability insurance that might cover Bernier's claim therein. *Id.* ¶ 75. Under California Civil Code § 47(b)(3), concealing existence of insurance is allegedly not privileged. *Id.*

On September 18, 2009, Jessie Croteau allegedly then sued UCIC for not having defended him and ICS against Bernier's complaint in the Construction Case. *Id.* ¶ 76.

Mr. Klone, UCIC's claims administrator, allegedly never inspected the Property. *Id.* ¶ 77. Klone allegedly testified that Hans Croteau made a telephone call to Klone. *Id.* Mr. Klone

allegedly testified he already knew that Hans Croteau was a vexatious litigant. *Id.* Hans Croteau allegedly never called Mr. Klone. *Id.*

Jessie Croteau and UCIC allegedly waived Bernier's coverage for damages to the Property prior to that waiver; UCIC allegedly agreed to pay Jessie Croteau's future attorneys. *Id.* ¶ 78. Neither UCIC, nor Travelers, allegedly told Bernier that her coverage would be waived in settlement. *Id.*

The settlement between Jessie Croteau and UCIC was then allegedly presented to the court as a legitimate agreement. *Id.* ¶ 79. The court was allegedly deceived into accepting this settlement which allegedly influenced the outcomes of all subsequent legal proceedings. *Id.* This UCIC settlement was allegedly a scheme to deny Bernier her benefits and deceive the court into upholding it. *Id.*

UCIC allegedly filed for liquidation in Delaware on August 21, 2013. *Id.* ¶ 80. On March 12, 2014, Bernier allegedly filed a claim in the UCIC liquidation. *Id.* The liquidation of UCIC is allegedly still pending. *Id.*

On May 26, 2011, Jessie Croteau and ICS allegedly sued the Plaintiffs for malicious prosecution. *Id.* ¶ 81. Jessie Croteau allegedly tendered the Plaintiffs' defenses to Travelers. On June 30, 2011, Travelers allegedly assigned its tripartite attorneys to defend the Plaintiffs subject to a reservation of rights, including the right to deny coverage for a "willful act" under California Insurance Code § 533. *Id.* Travelers' attorney allegedly advised the Plaintiffs that indemnification would be unlawful and he was allegedly authorized to bind Travelers to that promise. *Id.* ¶ 82. The Plaintiffs allegedly relied on his promise and relied on his advice that it had not identified a conflict under California Civil Code § 2860(a), that none existed, and without Plaintiffs' demand for indemnification, no conflict could arise because the public policy

did not permit Insurance Code § 533 and Civil Code § 1668 to be waived. *Id.*

Civil Code § 2860(a) allegedly requires the insurer to inform the insured "that a possible conflict may arise or does exist." *Id.* ¶ 83. Insurance Code § 533 and Civil Code § 1668 allegedly prohibit the indemnification of third-party claims for willful acts to prevent encouraging illegal behavior. *Id.*

Based on the promise and advice of an attorney, Mark Vranjes, the Plaintiffs allegedly accepted Jessie Croteau's tender to Travelers and signed a "Waiver of Right to Select Independent Counsel." *Id.* ¶ 84.

On July 26, 2011, Travelers allegedly informed the Plaintiffs that, in its opinion, a conflict could later arise with respect to Jessie Croteau's action in which Travelers had agreed to defend the Plaintiffs. *Id.* ¶ 85.

Mark Vranjes allegedly advised the Plaintiffs that Travelers' opinion was based on the contingency that the Plaintiffs request third-party indemnification of this otherwise uncovered claim. *Id.* ¶ 86. Plaintiffs again allegedly relied on Vranjes' advice and thus refrained from demanding "Cumis" counsel. *Id.*

On March 5, 2012, Jessie Croteau allegedly made a Policy Limits Settlement Demand to the Plaintiffs. *Id.* ¶ 87.

Instead of relying on the audio recording where Jessie Croteau had allegedly admitted to having no written contract, on March 15, 2012, Travelers allegedly promised that "it is against the law and public policy of California to permit indemnity coverage for malicious prosecution claims" and it referred to *Downey Venture v. LMI Ins. Co.*, (1998) 66 Cal.App.4th 478. *Id.* ¶ 88. The Plaintiffs allegedly justifiably relied on Travelers' direct promise and they again refrained from demanding "Cumis" counsel. *Id.*

On September 13, 2012, Bernier allegedly filed bankruptcy. *Id.* ¶ 89. Travelers allegedly took that opportunity to enable Jessie Croteau to avoid his liability through a "Settlement". *Id.* On October 23, 2012, Vranjes allegedly informed Plaintiffs that Travelers had negotiated to pay Jessie Croteau and ICS $325,000 during Bernier's bankruptcy stay and without Plaintiffs' knowledge or consent. *Id.* The Plaintiffs allegedly claimed this as a conflict. *Id.*

The Settlement had allegedly violated public policy. *Id.* ¶ 90. It was allegedly unlawful because it had required Travelers to indemnify Jessie and ICS for claims that were prohibited by Insurance Code § 533. *Id.*

Plaintiffs allegedly immediately withdrew their tenders of defenses. *Id.* ¶ 91. Plaintiffs allegedly waived all Policy benefits and informed Travelers that Plaintiffs would represent themselves in pro se. *Id.*

On December 3 and 12, 2012, Travelers allegedly denied Plaintiffs' waiver of the Policy and withdrawals of their tenders of defenses. *Id.* ¶ 92. Travelers allegedly claimed they were bound by their prior waivers. *Id.*

Travelers then allegedly instructed its tripartite attorneys to refuse to withdraw from Plaintiffs' defenses. *Id.* Those attorneys then allegedly refused to withdraw, refused to provide any further coverage advice to Plaintiffs and drafted the Settlement purportedly on behalf of Plaintiffs. *Id.*

On December 19, 2012, Mark Vranjes allegedly admitted "I do not know if the selection of independent counsel (Cumis) would have any effect on Travelers decision to attempt to settle the case." *Id.* ¶ 94. The Plaintiffs allegedly feared that Travelers would consummate the Settlement while they sought independent counsel. *Id.* Plaintiffs allegedly insisted on waiving the Policy because Jessie Croteau had no direct claim thereto, resulting in detriment when it was

consummated without their consent. *Id.*

On December 24, 2012, Travelers, Jessie Croteau, and ICS nevertheless allegedly consummated the Settlement. *Id.* ¶ 95. On December 27, 2012, the Plaintiffs allegedly complained to the California Department of Insurance that the Settlement violated Insurance Code § 533. *Id.*

Travelers and Jessie Croteau allegedly coordinated strategies to lift Bernier's bankruptcy stay in order to proceed with the Settlement and to dismiss her adversary proceeding with prejudice. *Id.* ¶ 96.

The court allegedly lifted Bernier's stay and she appealed that bankruptcy order. *Id.* ¶ 97. While that appeal was pending, Travelers allegedly consummated the Settlement, rendering her appeal moot. *Id.*

The court's allegedly failure to reject the Settlement, which allegedly violated Insurance Code § 533 by indemnifying claims of willful acts, allegedly furthered the improper and unlawful actions against the Plaintiffs. *Id.* ¶ 98.

The Settlement was allegedly a fraud on the court. *Id.* ¶ 99. Travelers allegedly used Vranjes to maintain control over Plaintiffs' defenses. *Id.* Despite allegedly admitting on December 26, 2012, "the attorney-client relationship with our firm has been terminated," Vranjes allegedly assumed to represent Bernier at a hearing on January 15, 2013, thus allegedly conniving at Plaintiffs' defeat and deceiving the court. *Id.*

The Plaintiffs allegedly retained an attorney, Glenn T. Rosen, who allegedly filed the matter of *Bernier et al v. Travelers et al.*, hereinafter the "Travelers Case" in a California court on July 22, 2013, allegedly requesting to set aside the Construction Case outcome and to declare the Settlement invalid. *Id.* ¶ 100.

17

Additionally, in response to three (3) separate alleged breaches of the Settlement by Jessie Croteau, Travelers allegedly refused to investigate or enforce the Settlement. *Id.* ¶ 101. Instead, Travelers allegedly forwarded Plaintiffs' complaints directly to Jessie Croteau's attorney, Patrick Howe, and it relied on Howe to address the issues. *Id.*

Bernier's former attorney, Alicia Dearn, allegedly admitted that she had "contacted the defendants" in all her lawsuits and had "obtained their cooperation" to "support a vexatious litigant order". *Id.* ¶ 102. This allegedly evinces they knew that Judge So's order had been baseless. *Id.* Dearn allegedly knew she had been "required to dismiss a case" due to her inability to post a bond and imagined it would happen to all her suits, revealing the motion was designed to deny substantive review. *Id.*

In Bernier's malpractice lawsuit against pre-trial attorney Edward Freedman from the Construction Case, Dearn had allegedly recorded an interrogation of Bernier using the pretext of preparing for litigation, but it was allegedly designed to manipulate her into abandoning her claims. *Id.* ¶ 103. This audio recording was allegedly used to gather information in a hostile manner to benefit Jessie Croteau and Travelers like Travelers had done when it recorded its own insured in depth. *Id.* Freedman and Kinsey had allegedly threatened Bernier with malicious prosecution and Dearn had allegedly agreed with them. *Id.*

Freedman also allegedly revealed the coordinated efforts among attorneys and insurance companies. *Id.* ¶ 104. He allegedly said that his own attorney told the insurance that Bernier is crazy, vexatious and she does not deserve one penny for any of her claims, and that "all attorneys are doing" it, indicating a widespread conspiracy to influence insurance companies to deny all her claims. *Id.*

When Bernier sued Freedman, he allegedly fabricated an alibi that aligned with Jessie

18

Croteau's and Travelers' narrative. *Id.* ¶ 105. Freedman alleged that he had informed Bernier about the potential to have Travelers cover her defense in the South Coast case but Bernier instructed him not to tender her defense because her lawsuit underlying the South Coast case had been baseless and vexatious. *Id.* Bernier had allegedly informed Travelers about Freedman when it recorded her in depth. *Id.* When Bernier deposed Freedman he allegedly admitted he was not aware of the potential for coverage. *Id.*

Dearn and Freedman's involvement allegedly illustrates a broad conspiracy transcending individual legal cases. *Id.* ¶ 106. Jessie Croteau and these attorneys allegedly ensured that their actions would influence insurance companies to refuse coverage and to support vexatious litigant motions. *Id.* They all allegedly cooperated to deprive the Plaintiffs of their constitutional right to assemble with counsel and to access the courts in furtherance of the conspiracy which permeated all of their legal matters. *Id.*

Travelers, Jessie Croteau and Dearn allegedly communicated and strategized to present attorney Dearn's motion to the court. *Id.* ¶ 107. Judge Pressman allegedly granted Dearn's motion. *Id.* Relying on that prefiling order, Travelers then allegedly filed its own vexatious litigant motion to ensure the dismissal of Plaintiffs' challenge to the Settlement without substantive review. *Id.*

On June 6, 2014, Judge Pressman allegedly prevented Hans Croteau from participating in a proceeding. *Id.* ¶ 108. The bailiff allegedly physically restrained Hans from crossing the court's banister. *Id.* When Bernier allegedly asked why Hans Croteau could not "cross the line", Judge Pressman allegedly said he was not allowed to participate in the hearing and cited Hans Croteau's vexatious litigant status as the only justification. *Id.*

On June 13, 2014, after Judge Pressman allegedly assured Bernier that the court would

provide a date for her motion for reconsideration, his clerk allegedly delayed the process and claimed that Plaintiffs' vexatious litigant status required review before scheduling the hearing. *Id.* ¶ 109. A subsequent clerk then allegedly refused to provide the hearing date. *Id.* The Plaintiffs allegedly successfully challenged Judge Pressman for bias and obtained that hearing date from a different judge. *Id.*

Based on allegedly inapposite law, Judge Strauss allegedly granted Travelers' vexatious litigant motion and ordered the Plaintiffs to post the bond. *Id.* ¶ 110. The bonds were allegedly not posted. *Id.* The court allegedly entered judgment in Travelers' favor on March 3, 2015, "with prejudice by operation of law." *Id.*

California procedural law had allegedly made it clear that the vexatious litigant motion by Travelers could not, and therefore did not result in a determination that was on the merits. *Id.* ¶ 111. The Plaintiffs allegedly filed an appeal. *Id.* California appellate justices allegedly denied Plaintiffs' right to appeal due solely to the Plaintiffs' vexatious litigant label, allegedly demonstrating how improper influence caused the denial of the Plaintiffs' rights to meaningful court access in perpetuity. *Id.*

The vexatious litigant motion which Travelers had filed allegedly barred the Plaintiffs from continuing their claims in the Travelers Case by requiring an exorbitant bond that they were unable to post, effectively terminating this case to challenge the validity of the Settlement. *Id.* ¶ 113.

Travelers allegedly filed its vexatious litigant motion to retaliate against the Plaintiffs for having challenged the Settlement. *Id.* ¶ 114. Its motion was allegedly designed to punish the Plaintiffs for exercising First Amendment rights to petition the courts in redress of their grievances in prior lawsuits. *Id.*

Travelers' motion was allegedly designed to influence the court under color of law in furtherance of the conspiracy between Jessie Croteau, Travelers and Judge So to deprive the Plaintiffs of First and Fourteenth Amendment rights by allegedly preventing them from challenging the Settlement. *Id.* ¶ 115.

The use of vexatious litigant orders by state actors, including Judge Pressman, to restrict the participation in proceedings and intimidate Hans Croteau is allegedly a shared strategy to deprive the Plaintiffs of their constitutional rights. *Id.* ¶ 116. Jessie Croteau and Travelers allegedly influenced the court to adopt obstructive measures to prevent their redress of grievances and their assembly with counsel. *Id.*

On February 16, 2017, Howe allegedly served Plaintiffs with a subpoena in the Rosen Case. *Id.* ¶ 117. Jessie Croteau's attorney, Patrick Howe, had allegedly served a temporary restraining order on January 16, 2014, to keep Hans Croteau away from Howe's office wherein Plaintiffs were summoned. *Id.*

The Plaintiffs, relying on the terms of the Settlement which applied to the Rosen Case, allegedly requested that Travelers provide legal representation for the deposition, but it denied that request, claiming the suit involved Rosen, not the prior suit. *Id.* ¶ 118. Hans Croteau allegedly moved to intervene in the Rosen Case to challenge the Settlement or to enforce its promissory benefits, but Judge Deddeh allegedly denied relief, claiming that Hans wishes to relitigate issues which had been resolved. *Id.*

The Plaintiffs allegedly filed the Southern District Case on May 18, 2017, to challenge the Settlement, requesting that Travelers provide an attorney for the Rosen Case. *Id.* ¶ 119. Travelers allegedly filed a vexatious litigant motion and Judge Anello delayed ruling on it until after the judgment in the Rosen Case, rendering the Plaintiffs' challenge moot. *Id.* His injunction

allegedly refers to that judgment. *Id.*

On February 15, 2019, the Plaintiffs allegedly requested to sue Travelers to comply with the subpoenas, prevent prospective damages against Rosen and moved to be removed from the vexatious list. *Id.* ¶ 120. Judge Sturgeon allegedly cancelled Bernier's motion, arbitrarily denied Hans Croteau's motion, and while recognizing a conspiracy to get Judge So to enter the order, found it was filed late. *Id.*

On April 5, 2019, Plaintiffs allegedly filed the Central District Case to declare the Settlement void because that is where the insurance agent who had sold her the Policy was. *Id.* ¶ 121. Travelers allegedly filed another federal vexatious litigant motion to block their Settlement challenge. *Id.*

Both the Southern and Central Districts allegedly granted Travelers' vexatious litigant motions, dismissing the Plaintiffs' claims. *Id.* ¶ 122. These actions were allegedly retaliation against the Plaintiffs for having exercised their First Amendment rights and they allegedly constituted a broader conspiracy involving Travelers and Jessie, misapplying vexatious litigant statutes to deny court access. *Id.*

Federal judges, Anello and Anderson, allegedly acted in comity with state judges despite the narrower federal standard for declaring a litigant vexatious. *Id.* ¶ 123. Magistrate Mumm allegedly found the state prefiling orders and federal injunction "instructive", that the Plaintiffs' claims were "delusional", they had a "vendetta", they thought their attorneys were "easy prey", they seek "to sidestep the pre-filing orders in the San Diego courts" and they were "forum shopping". *Id.* Judge Anderson allegedly adopted these recommendations without addressing the Plaintiffs' objections. *Id.*

Judge Anello allegedly admitted that his injunction was out of comity with state judges

by finding that "based on the prior lawsuits and Plaintiffs' attempts to file lawsuits in the San Diego Superior Court notwithstanding being declared vexatious litigants, the court does not believe that other sanctions would adequately protect the courts and prospective defendants." *Id.* ¶ 124.

The Defendant's vexatious litigant motions had allegedly identified the amount of litigation but no specific vice. *Id.* ¶ 125. These allegedly retaliatory injunctions are void on their faces and unduly vague. *Id.*

In September 2019, the Plaintiffs allegedly raised concerns with DA Summer Stephan, but Deputy District Attorney Mosler allegedly explicitly refused, in writing, to investigate the "ongoing financial/elder abuse" as the District Attorney was "on notice of the start of the reported abuse" and statute of limitation had run. *Id.* ¶ 126.

The Plaintiffs allegedly petitioned the Southern District court on January 7, 2020, for a writ of mandate against the Department of Insurance to take action on the challenge to the Settlement which Judge Anello allegedly dismissed based on his injunction further threatening contempt sanction. *Id.* ¶ 127.

Moreover, after dismissing the Plaintiffs' Southern District Case, Judge Anello allegedly oversaw a process during appeal where crucial evidence—sealed evidence that Plaintiffs had retrieved from the San Diego Sheriff's Department—was purportedly "lost" or destroyed. *Id.* ¶ 128.

Jessie Croteau's collaboration with Travelers and state actors such as judges, the DDA and DAG allegedly led to dismissals that deprived Plaintiffs of their First and Fourteenth Amendment rights. *Id.* ¶ 129. Federal judges allegedly closed California court doors via retaliatory-prosecution injunctions. *Id.*

In an alleged mischaracterization, Deputy Attorney General Laura E. Robbins allegedly argued the Plaintiffs admitted to being "declared" vexatious. *Id.* ¶ 130. The Ninth Circuit judges thus allegedly affirmed Judge Anello's dismissal. *Id.*

Unless injunctive relief is granted to prevent the enforcement of the vexatious litigant orders and retaliatory-prosecution injunctions, the Plaintiffs will allegedly suffer irreparable harm. *Id.* ¶ 131. These injunctions have allegedly resulted in the ongoing denial of their constitutional right to petition for redress, access to courts and assembly with counsel. *Id.* The chilling effect on the Plaintiffs' litigation efforts has allegedly effectively barred them from seeking justice for ongoing violations. *Id.*

On June 3, 2022, because the Policy allegedly contains a Forum Selection Clause which identified "our jurisdiction" as the proper venue, the Plaintiffs allegedly filed the matter of B*ernier et al v Travelers* in the Hartford Superior Court. *Id.* ¶ 133. That case allegedly sought to declare the Settlement void, enforce its summary procedure, or restrain any further violations of its promissory benefits. *Id.*

Travelers allegedly filed another adverse motion, now with the Hartford Superior Court, invoking the doctrine of *forum non conveniens*. *Id.* ¶ 134. The primary purpose of using this procedure was allegedly to dismiss that case without substantive due process. *Id.* Despite having allegedly filed its UMZ7908 and HAY7166 claim notes in the Southern District to support summary judgment, Travelers moved to seal the claim notes in Hartford as they contained communication with non-parties. *Id.*

Travelers' defense in support of its FNC motion was allegedly res judicata and collateral estoppel based on the dismissal of the Travelers Case. *Id.* ¶ 135. That motion, as supported by the prior lawsuits and Plaintiffs' vexatious litigant label, allegedly constituted prohibited state

action in retaliation for the exercise of First Amendment free speech and petitioning rights in

redress of grievances. *Id.*

Travelers allegedly continued its pattern of obstruction in the Hartford court, refusing any

meaningful participation and actively hindering efforts to resolve Plaintiffs' claims. *Id.* ¶ 136.

Travelers allegedly rejected Plaintiffs' offer to discuss settlement with UCIC on

September 30, 2022, moved to dismiss Plaintiffs' appeal on March 9, 2023, and made no

settlement offer at the mandatory settlement negotiations with Judge Palmer on June 22, 2023.

*Id.* ¶ 137. This final overt act was allegedly part of Travelers' efforts to deny Plaintiffs justice,

thereby tolling any statute of limitations under the continuing violations doctrine. *Id.*

### B.    Procedural History

On June 17, 2024, the Plaintiffs filed their Complaint. Compl., ECF No. 1.

On August 31, 2024, Travelers filed a motion to dismiss the Complaint. Mot. to Dismiss,

ECF No, 16.

On October 11, 2024, the Plaintiffs filed a motion to amend their Complaint. Mot. to

Amend, ECF No. 22.

On October 29, 2024, the Court granted the Plaintiffs' motion to amend their Complaint.

Order, ECF No. 26.

On that same day, the Court denied Traveler's motion to dismiss the Complaint as moot

in anticipation of the filing of an Amended Complaint. Order, ECF No. 27.

On that same day, the Plaintiffs filed their Amended Complaint. Amd. Compl.

On November 12, 2024, Travelers filed a motion to dismiss the Amended Complaint,

Mot. to Dismiss, ECF No. 30, and their memorandum in support of their motion to dismiss. Mot.

On December 3, 2024, the Plaintiffs filed an objection to Travelers' motion to dismiss the

Amended Complaint, Objection, ECF No. 31, and their memorandum in support of their objection to Travelers' motion to dismiss the Amended Complaint, Mem. in Support of Obj., ECF No. 31-1 ("Obj.").

On December 17, 2024, Travelers filed to the Plaintiffs' objection to their motion to dismiss. Reply, ECF No. 32 ("Reply").

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (alteration in original) (citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification ... to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views

the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of N.Y.C.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

"[A] statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014). If a review of the complaint and other permissible documents reveals "that the claims are prima facie time-barred, the burden is on the plaintiff to 'plausibly alleg[e] that they fall within an exception to the applicable statute of limitations.'" *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 611-12 (S.D.N.Y. 2021) (quoting *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 436 (S.D.N.Y. 2014)), *aff'd*, *Roeder v. J.P. Morgan Chase & Co.*, No. 21-552, 2022 WL 211702 (2d Cir. Jan. 25, 2022) (summary order).

III.    **DISCUSSION**

In their motion to dismiss, Travelers seeks to dismiss all counts of the Plaintiffs' Amended

Complaint because (1) the Plaintiffs' claims are time-barred by the three-year statute of limitations, (2) the Amended Complaint fails to state a claim for a Section 1983 Civil Conspiracy, and (3) the Amended Complaint fails to state a claim under *Bivens*. Mot. at 1-2.

The Court will address each count in turn.

## A. The Section 1983 Claims

Section 1983 provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress

42 U.S.C. § 1983.[2]

Put more simply, "[Section] 1983 allows private parties to sue state actors who violate their 'rights' under 'the Constitution and laws' of the United States." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2227 (2025). "The purpose of [Section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

 "[M]unicipalities and other local governmental bodies are 'persons' within the meaning of § 1983[,]" *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 689 (1978)), so long as the plaintiff suing under Section 1983 identifies a "municipal 'policy' or 'custom' that caused the

---

[2] "Congress enacted § 1 of the Civil Rights Act of 1871, [] the precursor to § 1983, shortly after the end of the Civil War 'in response to the widespread deprivations of civil rights in the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers.'" *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989) (quoting *Felder v. Casey*, 487 U.S. 131, 147 (1988)).

plaintiff's injury." *Brown*, 520 U.S. at 403. But there is a critical distinction between state actors, such as a municipality or a local governmental body and a State itself, which cannot be sued due to sovereign immunity under the Eleventh Amendment. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989) ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity[.]").

Private actors can also be sued under Section 1983, but only when they engage in state action or act under the color of state law such that their actions can be attributable to the state. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) ("'Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [Section 1983]. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents[.]'" (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)); *Malesko v. Corr. Servs. Corp.*, 229 F.3d 374, 381 (2d Cir. 2000) ("The Supreme Court has made it clear that private corporations engaging in state action may be sued under § 1983." (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936–37 (1982) (finding a private corporation liable under Section 1983 when it acted under the color of state law to participate in a deprivation of property through state action))), *rev'd on other grounds*, 534 U.S. 61 (2001); *see also Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("Thus, we say that state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." (internal citations and quotation marks omitted)).

"For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity has been delegated a public function by the state, ('the public function test')." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad.,* 531 U.S. at 296) (cleaned up) (citations and internal quotation marks omitted).

Travelers argues that the Plaintiffs' Section 1983 claims should be dismissed because (1) the Plaintiffs have failed to state a viable Section 1983 claim, Mot. at 22–27, and (2) the Section 1983 claims are time-barred. *Id.* at 18–22.

The Court will address each argument in turn.

1. *Failure to State a Claim*

"In order to survive a motion to dismiss on [a] § 1983 conspiracy claim, [a plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. In addition, 'complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.'" *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) and *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)); *see also Pacicca v. Stead*, 456 Fed. App'x 9, 12 (2d Cir. 2011) (finding that the district court did not err in finding for the defendant, who was a private actor, because "Pacicca

30

presents no evidence that Stead entered a conspiracy with White Plains police").

"A private party involved in a conspiracy with state actors can be liable under § 1983, but to sustain such a claim, the plaintiff must allege facts showing an agreement or meeting of the minds between the state actor and private actor to engage in a conspiracy to deprive the plaintiff of a constitutional right." *Burke v. APT Found.*, 509 F. Supp. 2d 169, 174 (D. Conn. 2007); *see also Dennis v. Sparks*, 449 U.S. 24, 27 (1980) ("As the Court of Appeals correctly understood our cases to hold, to act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting see 'under color' of law for purposes of § 1983 actions.").

Travelers argues that the Section 1983 claim in the Plaintiffs' Amended Complaint is deficient because (1) "it fails to specifically identify the state actor with whom Travelers allegedly entered into an agreement as part of the § 1983 conspiracy," Mot. at 25, (2) "Plaintiffs fail to allege a meeting of the minds and fail to allege that Travelers made any agreement whatsoever[,]" *id.*, and (3) the "Plaintiffs fail to allege Travelers' direct or personal involvement in the alleged constitutional deprivation." *Id.* at 26.

In opposition, the Plaintiffs argue that they properly allege "a meeting of the minds through cooperation and concerted action between Travelers, Jessie, and Judge So," Opp'n at 32, because their Amended Complaint "alleges a deliberate conspiracy to weaponize fabricated evidence and procedural barriers," that started with the entry of the vexatious litigant order, which "Travelers engaged in coordinated efforts to sustain the baseless order's effects. *Id.* at 33.

In reply, Travelers argues that "Plaintiffs fail to allege anything about the alleged conspiracy except speculative generalities." Reply at 10.

The Court agrees.

The purpose behind Section 1983 is to allow "private parties to sue state actors who violate their 'rights' under 'the Constitution and laws' of the United States." *Medina*, 145 S. Ct. at 2227. Here, the Plaintiffs are attempting, however, to sue a private corporation for the alleged violation of their rights that allegedly occurred in concert with state court judges over fifteen years ago. *See generally* Amd. Compl. While claims of conspiracies between private and state actors are allowed under Section 1983, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello*, 292 F.3d at 325.

To sustain a Section 1983 civil conspiracy claim, there must be a "factual basis supporting a meeting of the minds, such as that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (quoting *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)). But Plaintiffs have not provided any allegations that Travelers engaged in state action such that, as the Second Circuit laid out in *Sybalski*, (1) Travelers' actions were under the coercive power of the state or was controlled by the state; (2) Travelers was provided significant encouragement by the state, willfully participated in joint action with the state, that its functions were entwined with state policies, or (3) that Travelers had been delegated a public function by the state.

And, in the long recitation of facts in the Amended Complaint, Plaintiffs do not point to a single communication or joint effort between Travelers and any state actor that can properly allege an agreement or meeting of the minds to deprive the Defendants of their constitutional rights. *See, e.g.*, *Ocasio v. City of Canandaigua*, 513 F. Supp. 3d 310, 324 (W.D.N.Y. 2021) ("Because

plaintiffs do not allege that any communication, meeting of the minds or cooperative effort took place between Kadien and the DOCCS defendants that might lend plausibility to their allegations that Kadien conspired together with the DOCCS defendants to deprive Guardiola of her constitutional rights, their conspiracy claim against Kadien is dismissed."); *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 331 (E.D.N.Y. 2010) ("Here, Plaintiff has failed to plead a conspiracy because she has not alleged any facts showing that Greenwood and/or the SCWA entered into any type of agreement with the other Defendants."), *aff'd*, 417 F. App'x 96 (2d Cir. 2011).

Instead, Plaintiffs merely speculate from separate actions taken by Travelers and various judges over the last fifteen years to conclude that a conspiracy occurred. *See, e.g.*, Amd. Compl. at ¶ 53 ("The outcomes of the South Coast, Construction and Employment Cases were the result of a coordinated effort by Jessie, Travelers and state actors to deprive Plaintiffs of their rights. Judge So's baseless order and his ineffective order to strike laid the groundwork for these outcomes which violated Plaintiffs' constitutional rights by preventing their redress of grievances."). While Plaintiffs also point to various alleged "overt acts" that Travelers took in support of the conspiracy, *see, e.g.*, Opp'n at 35 ("The sharing of [Bernier's] confidential file was a breach of Travelers' 'special relationship' with Bernier and an overt act in furtherance of the conspiracy"), because the Plaintiffs have not alleged any agreement or meeting of the minds between Travelers and state actors towards some shared goal, they cannot point to any "overt act done in furtherance of that goal." *Ciambriello*, 292 F.3d at 325; *see Ocasio*, 513 F. Supp. 3d at 324 (dismissing civil conspiracy claim despite allegations of "overt acts" because "plaintiffs do not allege that any communication, meeting of the minds or cooperative effort").

Without such allegations, and given the merely conclusory ones alleging that Travelers

conspired with state court judges, *see supra* at 32–33[3], Plaintiffs' Section 1983 claims against Travelers must be dismissed. *See Ciambriello*, 292 F.3d 307, 324 (2d Cir. 2002) ("We agree with CSEA that Ciambriello's conclusory allegations are insufficient to state a [Section] 1983 claim against it. To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act. Put differently, a private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents. A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a [Section] 1983 claim against the private entity." (internal citations and quotation marks omitted)); *see, e.g.*, *id.* ("Because CSEA is not a state actor, and Ciambriello has not alleged sufficient facts to support the conclusion that it acted under color of state law, Ciambriello's § 1983 claims against CSEA must be dismissed."); *Durant v. Union Loc. 237*, No. 12-CV-1166 NGG JMA, 2013 WL 1232555, at *9 (E.D.N.Y. Mar. 4, 2013) ("Although a plaintiff can establish that a private party acts under color of state law by conspiring with a state actor to commit an unconstitutional act, '[a] merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.' [*Ciambriello*, 292

---

[3] In fact, many of the actions that the Plaintiffs complain about are judges merely being persuaded by Travelers arguments and ruling in their favor. *See, e.g.*, Amd. Compl. at ¶ 122 ("Both the Southern and Central Districts granted Travelers' vexatious litigant motions, dismissing Plaintiffs' claims. These actions were retaliation against Plaintiffs for having exercised their First Amendment rights and they constituted a broader conspiracy involving Travelers and Jessie, misapplying vexatious litigant statutes to deny court access."). Such actions taken in the course of a legal proceeding cannot sustain a claim for civil conspiracy. *See Dennis v. Sparks*, 449 U.S. 24, 28 (1980) ("Of course, merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co–conspirator or a joint actor with the judge.").

F.3d] at 324; *accord Arredondo v. Cnty. of Nassau*, No. 11–CV–710, 2012 WL 910077, at *5 (E.D.N.Y. Mar. 16, 2012). Here, plaintiff's only allegation concerning the alleged conspiracy is her conclusory assertion that defendants acted 'in concert' with NYCHA. That is insufficient to state a conspiracy claim against defendants, and none of the factual allegations in plaintiff's complaint plausibly suggest a conspiracy between NYCHA and defendants. Therefore, I respectfully recommend that the Court dismiss plaintiff's § 1983 claim without prejudice."), *report and recommendation adopted*, No. 12-CV-1166 NGG JMA, 2013 WL 1247520 (E.D.N.Y. Mar. 26, 2013); *Cordell v. Unisys Corp.*, 66 F. Supp. 3d 363, 365 (W.D.N.Y. 2014) ("Plaintiff does not allege any facts suggesting that Unisys is a state actor (and Unisys credibly alleges that it is not), nor does plaintiff allege any alternate basis upon which actions by Unisys may be fairly attributable to the State." (internal quotation marks omitted)).

Accordingly, having failed to state a plausible claim for Section 1983 civil conspiracy, Plaintiffs' Section 1983 civil conspiracy claim will be dismissed.

### 2. The Statute of Limitations Period

Even if Plaintiffs could state a plausible Section 1983 civil conspiracy claim, any such claim would have had to have been brought within the applicable statute of limitations period.

"[C]ourts are required to apply Connecticut's general or residual personal-injury statute of limitations to claims brought under § 1983." *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994). That statute of limitations period is three years. *See, e.g., id.* ("Accordingly, [Conn. Gen. Stat.] § 52–577 [Connecticut's tort statute of limitations period] should have been applied to plaintiffs' claims under § 1983. Since § 52–577 provides a three-year period of limitations, plaintiffs' claims were not barred.").

Federal law, however, controls when the cause of action accrues. *See Wallace v. Kato*, 549

U.S. 384, 388 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law."). It is well settled in the Second Circuit that the accrual date for section 1983 actions occurs "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013) (cleaned up); s*ee also Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir. 2019) (explaining that, in determining when a claim accrues, the "relevant inquiry" is not whether a party has "discovered the identity of the defendants," but rather whether the party is aware of the injury); *Traore v. Police Off. Andrew Ali Shield*, 2016 WL 316856, at *5 (S.D.N.Y. Jan. 26, 2016) (deliberate medical indifference claims accrue when the sought medical treatment is denied).

Travelers argues that the Plaintiffs' "§ 1983 [c]laim . . . [is] [t]ime-[b]arred [b]y the [t]here-[y]ear [s]tatute of [l]imitations[.]" Mot. at 12.

The Plaintiffs argue in objection that their claims are timely because their Amended Complaint "alleges . . . a coherent series and a continuous pattern of actions necessary to achieve the conspiracy's objective[,]" Obj. at 26,[4] and their "claims warrant equitable tolling based on systemic concealment[.]" *Id.* at 27.

In reply, Travelers argues that the "Plaintiffs had until October 16, 2010, which is three years from the entry of the so-called 'baseless' order of October 16, 2007, to bring . . . their § 1983 claim . . . against Travelers." Reply at 5.

The Court agrees.

Here, the Plaintiffs' § 1983 claims center upon the enforcement and consequences of a pre-filing order issued by a California Judge (Judge So) on October 16, 2007, labeling the plaintiffs as

---

[4] Where a document's internal page numbers conflict with the ECF-generated pagination, the Court refers to the ECF-generated pagination.

vexatious litigants. *See* Amd. Compl. ¶ 20 ("On October 16, 2007, the Presiding Judge of the San Diego Superior Court, State of California, Kenneth So, entered a "prefiling order" directed at both Plaintiffs."); *id.* ¶ 37 ("On April 14, 2009, despite the court's prior finding that the baseless order had been vacated as unsupported, Judge Nevitt found that 'it's been established that she is a vexatious litigant, or at least as of October 16, 2007, was.'").

Specifically, the Plaintiffs argue that Travelers conspired with state actors to weaponize the vexatious litigant designation, resulting in unfavorable outcomes in subsequent litigation. *Id.* ¶ 53. ("The outcomes of the South Coast, Construction and Employment Cases were the result of a coordinated effort by Jessie, Travelers and state actors to deprive Plaintiffs of their rights. Judge So's baseless order and his ineffective order to strike laid the groundwork for these outcomes which violated Plaintiffs' constitutional rights by preventing their redress of grievances.").

The alleged injury here is that "the courts [have] been effectively closed to Plaintiffs since October 16, 2007, the date of the entry of the baseless order." *Id.* ¶ 11. As a result, the Plaintiffs' § 1983 claims accrued on October 16, 2007, because that is the date that the Plaintiffs received notice of the injury that is the basis of this action. *See Hogan*, 738 F.3d at 518 (2d Cir. 2013) (holding that section 1983 actions accrue "when the plaintiff knows or has reason to know of the injury which is the basis of his action"); *Pauk v. Bd. of Trustees of City Univ. Of New York*, 654 F.2d 856, 861 (2d Cir. 1981) (finding that claim accrued in § 1983 employment discrimination case on date that employee received final notice of discharge and not on day of actual discharge); *see, e.g.*, *Porricelli v. Vecchiolla*, No. CIV.A. 3:04CV1483JCH, 2005 WL 1668124, at *3 (D. Conn. July 18, 2005) ("Here, where the Porricellis allege that their constitutional voting rights have been unlawfully interfered with by Defendants, the May 25, 2001 letter informing the Porricellis that their voter registrations have been cancelled clearly establishes the date of the

accrual of their claim.").

Thus, applying Connecticut's three-year statute of limitations, the latest date by which they could have timely filed suit was October 16, 2010.

Accordingly, because the Complaint was brought on June 17, 2024, the statute of limitations for the Plaintiffs' §1983 claims has lapsed. *See* Compl., ECF No. 1 (June 17, 2024).[5]

       i.     Tolling

As to whether the applicable statute of limitations period for Plaintiffs' Section 1983 actions can be tolled, federal courts look to state law. *See Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 2007) ("Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled . . . .").

Connecticut law permits tolling of the statute of limitations of tort actions due to fraudulent concealment of the cause of action, or a continuing course of conduct by the defendants. *See Macellaio v. Newington Police Dep't*, 75 A.3d 78, 83 (Conn. App. 2013) ("[Connecticut] General Statutes § 52–595 provides: 'If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.'"); *id.* at 84–85 ("Our Supreme Court has 'recognized ... that the statute of limitations and period of repose contained in [Connecticut] General Statutes § 52–584 may be tolled, in the proper circumstances, under the continuing course of conduct doctrine thereby

---

[5] Because the Amended Complaint "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading," the Amended Complaint "relates back to the date of the original pleading." Fed. R. Civ. P. 15(c)(1); *see also Peterson v. Ins. Co. of N. Am.*, 40 F.3d 26, 31 (2d Cir. 1994) ("[T]he amended complaint would relate back to the time that the initial complaint was filed for statute of limitations purposes.") (citing *Peterson v. Ins. Co. of N. Am.*, 822 F. Supp. 1040, 1043 n.4 (S.D.N.Y. 1993), *rev'd*, 40 F.3d 26 (2d Cir. 1994), and Fed. R. Civ. P. 15(c)).

allowing a plaintiff to bring an action more than three years after the commission of the negligent act. The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied.'" (quoting *Watts v. Chittenden*, 22 A.3d 1214 (Conn. 2011)) (cleaned up)); *see also Flannery v. Singer Asset Fin. Co., LLC*, 94 A.3d 553, 569 (Conn. 2014) ("In certain circumstances, however, we have recognized the applicability of the continuing course of conduct doctrine to toll a statute of limitations.").

Connecticut law also "permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity." *Chao v. Russell P. LeFrois Builder*, 291 F.3d 219, 223 (2d Cir. 2002) (cleaned up).

Travelers argues that "equitable tolling does not apply to save Plaintiffs' Complaint." Mot. at 20.

In objection, the Plaintiffs argue that their "claims warrant equitable tolling based on systemic concealment[.]" Obj. at 27.[6]

In reply, the Travelers argues that the "Plaintiffs have asserted no basis whatsoever to sustain the application of equitable tolling for approaching two decades[.]" Reply at 7.

The Court agrees, and will consider tolling based on continuous course of conduct, fraudulent concealment, and equitable tolling in turn.

---

[6] While the Plaintiffs argue that "[a]n evidentiary hearing is required because the verified [Amended Complaint], though disputed, meets the legal standards for equitable tolling[,]" Obj. at 27 (internal quotation marks omitted), because the Court has found that the Amended Complaint fails to allege any viable legal grounds for equitable tolling, no such evidentiary hearing is warranted. *See infra* at 46–48, 54–56; *see cf. Doe v. United States*, 76 F.4th 64, 70 (2d Cir. 2023) ("And a district court generally should conduct an evidentiary hearing before making factual findings if a plaintiff's 'sworn averments of fact, though disputed, meet the legal standards for equitable tolling.'" (quoting *Torres v. Barnhart*, 417 F.3d 276, 279 (2d Cir. 2005))).

a.   Continuing Course of Conduct

To invoke a continuing course of conduct to support tolling, "a plaintiff must allege that the defendant, '(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty.'" *Khan v. Yale Univ.*, 85 F.4th 86, 100 (2d Cir. 2023) (quoting *Flannery*, 94 A.3d at 570).[7]

Connecticut courts have found that plaintiffs alleging some wrongful or tortious act by the defendants is enough. *See, e.g.*, *Souza v. Algoo Realty, LLC*, No. 3:19-CV-00863 (MPS), 2020 WL 5300925, at *6 (D. Conn. Sept. 4, 2020) (finding that the plaintiffs properly alleged a continuing course of conduct when they alleged an initial wrong of the "Defendants' unauthorized use of Plaintiffs' images"); *Tchrs. Corner Hartford, LLC v. Connecticut Light & Power Co.*, No. HHDCV196120292, 2021 WL 4777069, at *3 (Conn. Super. Ct. Sept. 17, 2021) ("In the present case, the plaintiff alleges that the defendant informed the plaintiff November 9, 2017, that it was obliged to install submeters instead of individual meters in order to receive electrical service. This representation is also alleged to be false. Thus, the plaintiff alleges a later wrongful act that relates to the prior act . . . ."); *Gibson v. Metropolis of CT LLC*, No. 19-CV-00544 (KAD), 2020 WL 956981, at *7 (D. Conn. Feb. 27, 2020) ("Here, Plaintiffs allege that Defendants exploited

---

[7] Even assuming, arguendo, that Plaintiffs' allegations could support the application of the continuing course of conduct doctrine, it is doubtful whether the doctrine applies to claims that do not involve allegations of discrimination. *See Koehl v. Greene*, 2007 WL 2846905, *9 (N.D.N.Y.2007) ("[T]he weight of authority in the Second Circuit appears to hold that the continuing-violation doctrine may not be applied to Section 1983 civil rights claims that do not involve allegations of discrimination."); *see also Gierlinger v. Town of Brant*, No. 13-CV-370, 2015 WL 269131, at *7 (W.D.N.Y. Jan. 21, 2015) ("I question whether the continuing violation doctrine can even apply here to plaintiffs' claims of First Amendment retaliation which do not arise from their employment or from complaints of discrimination."); *Vested Bus. Brokers, Ltd. v. Cnty. of Suffolk*, No. 16CV4945JMASIL, 2017 WL 4122616, at *5 (E.D.N.Y. Sept. 15, 2017), *aff'd*, 741 F. App'x 39 (2d Cir. 2018) ("Even if the continuing violation doctrine might otherwise be applicable, it would not save Plaintiff's Section 1983 claims, which do not involve allegations of unlawful discrimination.").

Plaintiffs' images and likeness for commercial gain and left Plaintiffs' images on the Club's social media pages 'for months and/or years after their original publication.' (FAC ¶¶ 29, 77, 114, 130, 176.) The Court is therefore not prepared to hold that Plaintiffs, cannot, as a matter of law, invoke the continuing course of conduct doctrine to toll the statute of limitations for their invasion of privacy claims.").

"In order to support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after the commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. Where [the Connecticut] Supreme Court has upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Macellaio*, 75 A.3d at 85 (cleaned up).

The Second Circuit has recognized that Connecticut law may support equitable tolling based on later wrongful conduct when: (1) the date of the injury cannot be clearly identified, (2) the later conduct is part of a continuing pattern of wrongdoing, and (3) the resulting injuries are not distinct or independently actionable. *Khan*, 85 F.4th at 101 (holding that equitable tolling under Connecticut law was unwarranted where the later wrongful acts had a definite accrual date, were not part of a continuous pattern, and resulted in distinct injuries).

Here, Plaintiffs have plausibly alleged an initial wrong by alleging a Section 1983 civil conspiracy occurred when "[Travelers] caused Plaintiffs to be subjected, under color of law, to the deprivation of their constitutional rights by conspiring with state actors[,]" Amd. Compl. at ¶ 139, which began with the initial vexatious litigant marker. *See* Amd. Compl. ¶ 20 ("On October 16,

2007, the Presiding Judge of the San Diego Superior Court, State of California, Kenneth So, entered a "prefiling order" directed at both Plaintiffs."); *id.* ¶ 37 ("On April 14, 2009, despite the court's prior finding that the baseless order had been vacated as unsupported, Judge Nevitt found that 'it's been established that she is a vexatious litigant, or at least as of October 16, 2007, was.'").

But they do not allege any ongoing special relationship with the Defendants that would give rise to a continuing duty, other than their initial insured-insurer contractual relationship, *see* Amd. Compl. at ¶ 14 ("Bernier's 'Property' was covered by an all risk homeowner's insurance Policy, hereinafter the 'Policy', issued by Travelers for 2006 – 2007 . . . ."), which does not constitute a special relationship under Connecticut law. *See, e.g., Partitions, Inc. v. Blumberg Assocs., Inc.*, No. CV980576664S, 2001 WL 1332174, at *5 (Conn. Super. Ct. Oct. 9, 2001) ("[G]enerally these [special] relationships have been attorney-client, physician-patient, or some related sort of fiduciary-type relationship in which one party reasonably reposes trust in the other to exercise continuing care on his behalf."); *Ride, Inc. v. APS Tech., Inc*., 11 F. Supp. 3d 169, 187 (D. Conn. 2014) ("Under Connecticut law, it is clear that a regular contractual relationship between business entities . . . does not create a special relationship.").

The Plaintiffs also do not plausibly allege that tolling is warranted on account of "some later wrongful conduct related to the prior act." *Macellaio*, 75 A.3d at 85 ("Where our Supreme Court has upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act[.]"); *see also Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) ("When a plaintiff relies on a theory of equitable estoppel to save a claim that otherwise appears untimely on its face, the plaintiff must specifically plead facts that make entitlement to estoppel plausible (not merely possible).").

Since the Plaintiffs identify the date of their injury, October 16, 2007, this is not a situation where the date of injury is uncertain or difficult to determine. *Compare* Compl. at ¶ 11 ("[T]he machinery of those agencies and those courts has been effectively closed to Plaintiffs since October 16, 2007, the date of entry of the baseless order.")*, with Khan*, 85 F.4th at 101 ("[F]ar from being impossible to date, Doe's allegedly tortious acts are dated in Khan's own complaint at least as to month and year (early November 2015 and November 2018, respectively) and, with discovery, can likely be pinpointed given that the 2015 complaint was documented and the 2018 statements were made at a Yale UWC hearing before five identified UWC members.").

Their allegations also do not reflect a series of continuing acts, but rather at least nine separate lawsuits in various courts and states over the case of fifteen years. *See* Amd. Compl. at ¶ 14–137 (complaining of at least nine cases that they accuse Travelers of conspiring in from 2007 until 2022, including the South Coast Case, the Construction Case, the Employment Case, the Malicious Mischief Case, the United Contractors Insurance Company Case, the First Malicious Prosecution Case, The Travelers Case, The Second Malicious Prosecution/Rosen Case, and the Connecticut State Case, with sometimes two to three years between cases).

In *Khan v. Yale University*, the Second Circuit rejected equitable tolling where the plaintiff relied on two defamatory statements made three years apart because of the "significant temporal distance[.]" 85 F.4th at 101. Here, Plaintiffs likewise complain about cases years apart. *Compare* Amd. Compl. at ¶ 110 ("The court entered judgment in [the Travelers Case] in Travelers' favor on March 3, 2015[.]"), *with id.* at 117 (next case being the Second Malicious Prosecution/Rosen Case which began "[o]n February 16, 2017, [when] attorney Howe served Plaintiffs with a subpoena in the Rosen Case").

Significantly, Plaintiffs' alleged harms are distinct and independently actionable, not

continuing manifestations of a single injury. For example, the allegedly pre-filing vexatious litigation order happened in the 2007 Construction Case. *See* Amd. Compl. ¶ 20 ("On October 16, 2007, the Presiding Judge of the San Diego Superior Court, State of California, Kenneth So, entered a "prefiling order" directed at both Plaintiffs."); *id.* ¶ 37 ("On April 14, 2009, despite the court's prior finding that the baseless order had been vacated as unsupported, Judge Nevitt found that 'it's been established that she is a vexatious litigant, or at least as of October 16, 2007, was.'"). But Plaintiffs then proceed to complain of actions taken in cases started and ending after and outside of the Construction Case. *See* Amd. Compl. at ¶ 54–137 (complaining of at least eight cases after the Construction Case that they accuse Travelers of conspiring in from 2010 until 2022, including the South Coast Case, the Employment Case, the Malicious Mischief Case, the United Contractors Insurance Company Case, the First Malicious Prosecution Case, The Travelers Case, The Second Malicious Prosecution/Rosen Case, and the Connecticut State Case, with sometimes two to three years between cases).

Each of these alleged events occurred in discrete separate proceedings, involved different claims and outcomes, and caused distinct injuries from those outcomes, defeating any claim for tolling under the continuous course of conduct doctrine. *See Saint Bernard Sch. of Montville, Inc. v. Bank of Am.*, 95 A.3d 1063, 1078–79 (Conn. 2014) ("As to what constitutes a continuing violation of a breach, this court cited with approval the following explanation: 'In between the case in which a single event gives rise to continuing injuries and the case in which a continuous series of events gives rise to a cumulative injury is the case in which repeated events give rise to discrete injuries.... [In such a case] the damages from each discrete act ... would be readily calculable without waiting for the entire series of acts to end. There would be no excuse for the delay. And so the violation would not be deemed continuing.'" (quoting *Watts v. Chittenden*, 22

A.3d 1214, 1222 (Conn. 2011))); s*ee, e.g.*, *Khan* 85 F.4th at 101 ("Doe's 2015 and 2018 statements caused distinct injuries. Khan pleads that Doe's 2015 complaint caused his immediate suspension from Yale, while her 2018 hearing statements resulted in his expulsion. Moreover, the 2015 suspension was lifted in the fall of 2018, months before Doe's hearing statements. Insofar as Khan was re-suspended in October 2018, that was triggered by a Yale Daily News article reporting events not involving Doe. Nothing in these circumstances supports tolling the time for Khan to complain of tortious interference in November 2015 until November 2018. . . . A favorable decision at that hearing would not have remedied or even mitigated the suspension injury, which Khan had sustained fully by the fall of 2018. And the unfavorable decision actually reached at the hearing did not aggravate the completed suspension but, rather, imposed the additional injury of expulsion.").

As a result, there is no basis for tolling of the statute of limitations period based on a continuous course of conduct theory as a matter of law.

b.  Fraudulent Concealment

Under Connecticut General Statutes § 52-595, "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence." Conn. Gen. Stat. § 52-595.

To establish fraudulent concealment under Connecticut General Statutes § 52-595, a plaintiff must show: "(1) the defendants' actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff's cause of action; (2) the defendants' intentional concealment of these facts from the plaintiff; and (3) the defendants' concealment of these facts was for the purpose of obtaining delay on the plaintiff's part in filing a complaint." *Bartone v.*

*Robert L. Day Co.*, 656 A.2d 221, 225 (Conn. 1995). This standard must be met with "clear, precise, and unequivocal evidence." *Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn*, LLP, 912 A.2d 1019, 1033 (Conn. 2007).

The Complaint contains no allegations suggesting that Defendants concealed any material facts from Plaintiffs, let alone that they did so intentionally or for the purpose of delaying suit. The absence of such allegations forecloses any argument for tolling based on fraudulent concealment. *See, e.g.*, *Bailey v. Interbay Funding*, LLC, No. 3:17-CV-1457 (JCH), 2018 WL 1660553, at *13 (D. Conn. Apr. 4, 2018) ("Absent particularized allegations sufficient to plead fraudulent concealment, there is no basis to toll the statute of limitations on the fraud and civil conspiracy claims as alleged against Interbay and the Bayview defendants. These claims are, therefore, time-barred."); *Blew v. Jacobson*, No. 565433, 2004 WL 2443093, at *5 (Conn. Super. Ct. Oct. 5, 2004) ("The plaintiffs have neither affirmatively pleaded fraudulent concealment nor alleged sufficient facts to meet the burden of proving fraudulent concealment, and therefore, General Statutes § 52-595 will not toll the statute of limitations.").

As a result, there is no basis for tolling the statute of limitations period based on a fraudulent concealment theory as a matter of law.

### c.  Equitable Tolling

"[T]he equitable tolling doctrine . . . is one to which the courts may resort when no other tolling doctrines are applicable[.]" *Bednarz v. Eye Physicians of Cent. Connecticut, P.C.*, 947 A.2d 291, 297 n. 8 (Conn. 2008).

"The equitable tolling doctrine has not been addressed extensively by [Connecticut's appellate courts[,]" *Saperstein v. Danbury Hosp.*, No. X06CV075007185S, 2010 WL 760402, at *12 (Conn. Super. Ct. Jan. 27, 2010), however, other courts in Connecticut have found that

Connecticut's equitable tolling doctrine does not apply to Connecticut's general tort statutes, Connecticut General Statutes §§ 52–584, and 52–577. *See, e.g.*, *Saperstein*, 2010 WL 760402 at *13 ("General Statutes § 52–584 contains a two-year statute of limitations premised on a plaintiff's discovery of the injury. Because the equitable tolling doctrine is based on a 'discovery rule,' this doctrine would appear to be inapplicable to a statute such as § 52–584 which itself incorporates a discovery rule as part of the statutory limitation. Additionally, the law is well established that equitable tolling does not apply to statutes of repose. *Lampf v. Gilbertson*, 501 U.S. 350, 363–64, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *Connecticut Insurance Guaranty Ass'n v. Yocum*, [Superior Court, Judicial District of Hartford, Docket No. CV–94–0539691 S (June 6, 1996, Sheldon, J.) (17 Conn. L. Rptr. 343)]. Consequently, equitable tolling is inapplicable to extend the statutes of repose of General Statutes § 52–584 and § 52–555."); *Lopez v. Travelers Companies, Inc.*, No. AANCV156019474S, 2016 WL 2890477, at *6 (Conn. Super. Ct. Apr. 26, 2016) ("Based on *Saperstein*, [2010 WL 760402,] the equitable tolling doctrine is inapplicable to § 52–584 because this statute incorporates the "discovery rule" on which the equitable tolling doctrine is based. *Id.* Because the equitable tolling doctrine does not apply to statutes of repose, the doctrine is also inapplicable to § 52–577.")[8]

---

[8] Numerous decisions by this District's judges also yield a similar result. *See also Carter v. Univ. of Connecticut*, No. CIVA 3:04CV1625 SRU, 2006 WL 2130730, at *3 (D. Conn. July 28, 2006) ("Section 52–577 of the Connecticut General Statutes, the borrowed statute of limitations applicable in this case, has apparently never been held by an appellate court of Connecticut to be subject to the doctrine of equitable tolling. Instead, section 52–577 has been labeled a statute of repose, which 'sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues.'" (quoting Zapata v. Burns, 542 A.2d 700, 707 (Conn. 1988))), *aff'd*, 264 F. App'x 111 (2d Cir. 2008); *Chapman v. Sikorsky Aircraft Corp.*, No. 3:13-CV-518 SRU, 2015 WL 75493, at *3 (D. Conn. Jan. 6, 2015) ("It is not clear that equitable tolling, per se, is available in this case. Several Connecticut Superior Court judges have held that 'the doctrine of equitable tolling is inapplicable to a statute of repose, such as § 52–577 because a statute of repose cuts off the right of action after a specified period of time regardless of when the action accrues or when the plaintiff receives notice that his rights have been violated.'"

As a result, there is no basis for tolling of the statute of limitations period based on an equitable tolling theory as a matter of law.

Accordingly, having determined as a matter of law that no basis for tolling the relevant statute of limitations period to the Plaintiff's Section 1983 tort claims here, and that the three-year statute of limitations period has run on any plausible Section 1983 claim they could have been brought, these time-barred will be dismissed. *See, e.g.*, *Jarvis v. Lieder*, No. CV06 5001737, 2008 WL 4739796, at *18 (Conn. Super. Ct. Oct. 6, 2008) ("Since this action was commenced more than three years from that date, it is barred unless the statute of limitations is tolled by a recognized common-law or statutory exception."), *aff'd*, 978 A.2d 106 (Conn. 2009); *NovaFund Advisors, LLC v. Sandler, O'Neill & Partners, L.P.*, No. X03-CV-20-6138062-S, 2022 WL 1051396, at *9 (Conn. Super. Ct. Feb. 18, 2022) ("The plaintiff's claims are untimely under § 52-577 and none of the tolling doctrines invoked by the plaintiff have been proven. The court therefore enters judgment for the defendant.").

### B. The *Bivens* Claims

In *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).

"The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." *Id.* at 70. For that reason, the Supreme Court has not allowed *Bivens* to extend even to an individual federal officers' employer because "the threat of suit against an

---

(cleaned up) (*quoting Crow & Sutton Assoc., Inc. v. C.R. Klewin Ne.*, LLC, No. HHDX04CV054016823S, 2009 WL 1057977, at *4 (Conn. Super. Ct. Mar. 26, 2009))) (citing cases); *Hubbard-Hall, Inc. v. Monsanto Co.*, 98 F. Supp. 3d 480, 483 (D. Conn. 2015) ("Statutes of repose are not subject to equitable tolling, and apply even if the actionable harm underlying the claim has yet to be discovered." (citing *Saperstein*, 2010 WL 760402 at *13)).

individual's employer was not the kind of deterrence contemplated by *Bivens*." *Id.* (citing *Bivens*, 510 U.S. at 485 ("If we were to imply a damages action directly against federal agencies . . . there would be no reason for aggrieved parties to bring damages actions against individual officers. [T]he deterrent effects of the *Bivens* remedy would be lost.")).

To that end, in *Malesko*, where the Court was asked "to allow recovery against a private corporation operating a halfway house under contract with the Bureau of Prisons," *id.* at 63, the Court "decline[d] to so extend *Bivens*." *Id.* The Court reasoned that "if a corporate defendant is available for suit, claimants will focus their collection efforts on it, and not the individual directly responsible for the alleged injury." *Id.* at 71. Because allowing private entities to be sued under *Bivens* would not advance *Bivens'* core rationale of deterring individual officers from engaging in unconstitutional wrongdoing, the Court made clear that "inferring a constitutional tort remedy against a private entity . . . is therefore foreclosed." *Id.* at 71. For that reason alone, because the Plaintiffs are attempting to bring suit under *Bivens* against a private entity, Travelers*, the Plaintiffs' *Bivens* claim is foreclosed. *See, e.g., Orellana v. World Courier, Inc.*, No. 09-CV-S76 (NGG) (ALC, 2010 WL 3023528, at *3 (E.D.N.Y. July 29, 2010) ("[T]he Supreme Court has held that Bivens does not provide a cause of action against private entities. *Malesko*, 534 U.S. at 66. The Court clarified that Bivens only provides a cause of action against individual federal officers. *Id.* at 70. Even if Orellana had pleaded a Bivens claim against Kroll, the claim would have to be dismissed for failure to state a claim; Kroll is a private entity."); *Polite v. Residential*, No. 3:14-CV-01921 (VAB), 2016 WL 199400, at *2 (D. Conn. Jan. 15, 2016) (dismissing any *Bivens* claims against defendant Winn because, "[a] *Bivens* cause of action cannot lie against a private party like Winn, even if that organization acts under color of federal law").

Even if Plaintiffs could have a viable *Bivens* claim against Travelers—which, for the reasons cited above, they unequivocally could not—Travelers also argues that the Plaintiffs' *Bivens* claims should be dismissed because (1) the Plaintiffs have failed to state a viable Section 1983 claim, Mot. at 27–28, and (2) the *Bivens* claims are time-barred. *Id.* at 18–22.

The Court will address each argument in turn.

1. *Failure to State a Claim*

Since its decision in *Bivens*, the "Supreme Court has limited the availability of *Bivens* remedies to three kinds of cases: a Fourth Amendment claim arising from an unlawful search and arrest, *Bivens*, 403 U.S. 388; a Fifth Amendment claim based on sex-discrimination in the workplace, *Davis v. Passman*, 442 U.S. 228 (1979); and an Eighth Amendment claim for failure to provide adequate medical treatment. *Carlson v. Green*, 446 U.S. 14 (1980)." *Mendoza v. Edge*, 615 F. Supp. 3d 163, 169 (E.D.N.Y. 2022) (cleaned up).

"After those decisions, however, the Court changed course. . . . And for almost 40 years [the Court has] consistently rebuffed requests to add to the claims allowed under *Bivens*" *Hernandez v. Mesa*, 140 S. Ct. 735, 741, 743 (2020).

Travelers argues that the Plaintiffs have failed to state a *Bivens* claim because Travelers "is not an officer of the United States." Mot. at 28.

In opposition, the Plaintiffs argue that the Court should "extend Bivens to provide injunctive relief against federal judges who issue retaliatory injunctions to suppress a plaintiffs' court access." Opp'n at 27.

The Court declines to do so.

When determining whether to create a new *Bivens* claim, the court conducts a two-step inquiry. "First, we ask whether the case presents 'a new Bivens context'—i.e., is it

'meaningful[ly]' different from the three cases in which the Court has implied a damages action." *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 139 (2017)).

"Second, if a claim arises in a new context, a Bivens remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 136). "[I]f there is any reason to think that judicial intrusion into a given field might be harmful or inappropriate. If so, or even if there is the potential for such consequences, a court cannot afford a plaintiff a *Bivens* remedy." *Egbert*, 596 U.S. at 496 (cleaned up).

Plaintiffs seek to extend *Bivens* beyond its current contexts in order to "enjoin judges from other courts," Opp'n at 41, for their allegedly unconstitutional and illegal orders. The Supreme Court in other places has shown its hesitancy in expanding the power of the federal courts to enjoin state judges or overturn the decisions and orders of state courts. *See, e.g.*, *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) ("The *Rooker–Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Rooker–Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions."); *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) ("Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity. To be sure, in *Ex parte Young*,

this Court recognized a narrow exception grounded in traditional equity practice—one that allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law. But as *Ex parte Young* explained, this traditional exception does not normally permit federal courts to issue injunctions against state-court judges or clerks." (citing and referencing *Ex parte Young*, 209 U.S. 123, 159 (1908))).

As a result, the Court will decline to extend *Bivens* to the Plaintiffs' claims here and find that the Plaintiffs have not properly stated a *Bivens* claim. *See, e.g.*, *Arar v. Ashcroft*, 585 F.3d 559, 626 (2d Cir. 2009) (Pooler, J., dissenting) ("In cases in which the [Supreme] Court declined to extend *Bivens*, it did not resolve the issue simply by observing that it had to pause to consider special factors. Rather, the Court declined to extend *Bivens* because factors related to institutional competence and separation of powers strongly counseled hesitation."); *Younger v. Harris*, 401 U.S. 37, 43, 91 S. Ct. 746, 750, 27 L. Ed. 2d 669 (1971) (identifying a "longstanding public policy against federal court interference with state court proceedings"); *see also King v. Thomas*, No. 1:23-CV-9609, 2025 WL 1652124, at *2 (E.D.N.Y. June 10, 2025) (dismissing complaint and *Bivens* claims because the Court declined to extend *Bivens* to the new context).

Accordingly, even if a *Bivens* claim could be brought against Travelers, Plaintiffs' *Bivens* claims will be dismissed.

### 2. *The Statute of Limitations Period*

Even if Plaintiffs' *Bivens* claims were not otherwise foreclosed, any such claims would still have to have been brought within the applicable statute of limitations period. As with Section 1983 claims, the statute of limitations for *Bivens* claims is derived from state law, while the accrual date is governed by federal law. *See Kronisch v. United States*, 150 F.3d 112, 123 (2d

Cir. 1998) ("While state law supplies the statute of limitations period, 'federal law determines when a federal claim accrues.'" (quoting *Eagleston v. Guido*, 41 F.3d 865 (2d Cir. 1994)); *Chin v. Bowen*, 833 F.2d 21, 23 (2d Cir. 1987) ("*Bivens* actions are closely analogous to actions brought pursuant to section 1983 and therefore should be governed by the same statute of limitations.").

"*Bivens* actions arising in Connecticut must be brought within three years[.]" *Doe v. United States*, 76 F.4th 64, 70–71 (2d Cir. 2023). And "[a] *Bivens* claim accrues under federal law for statute of limitations purposes when a plaintiff either has knowledge of his or her claim or has enough information that a reasonable person would investigate and discover the existence of a claim." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015).

Travelers argues that the "Plaintiffs' . . . *Bivens* [c]laim [is] [t]ime-[b]arred [b]y the [t]hree-[y]ear [s]tatute of [l]imitations" Mot. at 18.

In objection, the Plaintiffs seem to argue that their *Bivens* claim "is subject to equitable tolling[.]" Obj. at 27.

In reply, Travelers argues that the "Plaintiffs had until October 16, 2010, which is three years from the entry of the so-called 'baseless' order of October 16, 2007, to bring . . . their *Bivens* claim . . . against Travelers." Reply at 5.

The Court agrees.

The Plaintiff's *Bivens* claims arise out of the same cause of action as their Section 1983 claims. *See* Amd. Compl. at ¶ 183 ([for *Bivens* action] "Plaintiffs re-allege and incorporate by reference paragraphs 1 through 182" which also set forth the allegations for their Section 1983 actions). As a result, the statutory period for the *Bivens* claims accrued on October 16, 2007, when Judge So issued the vexatious litigant pre-filing order, and the three-year statute of limitations

period lapsed on October 16, 2010. *See supra* at 35–38 (discussing the statute of limitations period for the Plaintiffs' Section 1983 claims).

Accordingly, the statute of limitations for the Plaintiff's *Bivens* claims has lapsed, and absent any tolling, any such claim must be dismissed.

i.   Tolling

*Bivens* actions can be subject to both equitable tolling and tolling under the continuing violations doctrine. *See Doe*, 76 F.4th at 71 ("Under federal law, however, the accrual of FTCA and Bivens claims may be subject to equitable tolling."); *Gonzalez v. Hasty*, 802 F.3d 212, 221 (2d Cir. 2015) ("We see no reason why the doctrine thus applied from time to time to Eighth Amendment claims against state actors brought under section 1983 would not in a proper case be applicable to an Eighth Amendment claim against federal officials brought under *Bivens*. The controlling feature of the doctrine is not the source of the right of action, but rather the characteristics of the claim." (internal citation omitted)).

Travelers argues that "equitable tolling does not apply to save Plaintiffs' Complaint." Mot. at 20.

In response, the Plaintiffs argue that their "claims warrant equitable tolling based on systemic concealment[.]" Obj. at 27.

In reply, the Travelers argues that the "Plaintiffs have asserted no basis whatsoever to sustain the application of equitable tolling for approaching two decades[.]" Reply at 7.

The Court agrees, having considered all applicable tolling doctrines.

a.   Equitable Tolling

"Equitable tolling is a doctrine that permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity." *Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000).

"Before a court may exercise discretion to grant equitable tolling, a litigant must demonstrate as a factual matter the existence of two elements: first, 'that some extraordinary circumstance stood in her way' and second 'that she has been pursuing her rights diligently.'" *Doe*, 76 F.4th at 71 (quoting *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011)). "The law prohibits a judge from exercising her discretion where these two elements are missing. If they are found to be present, however, then a judge brings discretionary considerations to bear in deciding whether to permit equitable tolling." *Doe*, 76 F.4th at 71.

The Second Circuit has found the requirements for equitable tolling to be satisfied "where the plaintiff actively pursued judicial remedies but filed a defective pleading during the specified time period[,]" *Brown v. Parkchester S. Condos.*, 287 F.3d 58, 60 (2d Cir. 2002) (internal quotation marks omitted); where "it would have been   impossible for a reasonably prudent person to learn" of the wrong that was committed, *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985); or where "a mental disability warrants equitable tolling[,]" *Brown*, 287 F.3d at 60.

The Court finds no reason to permit equitable tolling in this instance

The Plaintiffs argue that there was some "systematic concealment" preventing them from bringing suit. *See* Obj. at 27. For the same reasons discussed above with respect to the Connecticut fraudulent concealment tolling doctrine, this argument fails. *See supra* at 45–46.

As a result, because the Plaintiffs have not raised any compelling extraordinary circumstances warranting equitable tolling, the Court will not exercise its discretion to apply equitable tolling to the *Bivens* claims. *Brown v. Rsch. Found. of Suny Oneonta*, 381 F. App'x 119, 120 (2d Cir. 2010) (affirming dismissal of claims as time-barred where the "Appellant did not demonstrate extraordinary circumstances that would merit the application of equitable tolling") (citing *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir.2000) ("The burden of demonstrating the

appropriateness of equitable tolling, however, lies with the plaintiff.")).

b.  <u>Continuing Violation Doctrine</u>

The continuing violation doctrine "applies to claims 'composed of a series of separate acts that collectively constitute one unlawful practice.'" *Gonzalez*, 802 F.3d at 220 (cleaned up) (quoting *Washington v. Cty. of Rockland,* 373 F.3d 310, 318 (2d Cir. 2004)). "The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation,' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez*, 802 F.3d at 220 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)).

Consistent with the analysis above, that the different allegedly conspiratorial acts complained of by Plaintiffs "occurred in discrete separate proceedings, involved different claims and outcomes, and caused distinct injuries from those outcomes, defeating any claim for tolling under the continuous course of conduct doctrine[,]" *see supra* at 44, the continuing violation doctrine does not apply to the Plaintiff's *Bivens* claims. *See DeMuth v. United States Small Bus. Admin.*, 819 F. App'x 23, 26 n. 2 (2d Cir. 2020) ("Moreover, the continuing violation doctrine is inapplicable as the allegedly discriminatory acts are discrete acts and the continuing violation doctrine does not apply to discrete acts.") (citing *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 156 (2d Cir. 2012); *Daly v. Citigroup Inc.*, 939 F.3d 415, 429 (2d Cir. 2019) ("The defendants' misconduct, as alleged, consists of discrete, discriminatory acts . . . . They do not amount to an overarching policy of discrimination and are, therefore, insufficient to establish a continuing violation . . . .").

As a result, because no tolling doctrine applies, the Plaintiffs' *Bivens* claims are time-barred. *See, e.g.*, *Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011) ("Absent tolling, therefore,

56

his claims . . . would be barred by the three-year statute of limitations applied by federal courts

sitting in New York to *Bivens* claims."); *Harrison v. Lutheran Med. Ctr.*, No. 05-CV-2059CBA,

2007 WL 3023830, at *4 (E.D.N.Y. Oct. 12, 2007) (finding that since the plaintiff's claims were

outside of the statute of limitations, "his *Bivens* . . . claims are clearly time-bared unless equitable

tolling applies").

Accordingly, the Plaintiffs' *Bivens'* claims will be dismissed.

### C.  Leave to Amend

Under Federal Rule of Civil Procedure 15(a),

> [a] party may amend its pleading once as a matter of course no later
> than: (A) 21 days after serving it, or (B) if the pleading is one to
> which a responsive pleading is required, 21 days after service of a
> responsive pleading or 21 days after service of a motion under Rule
> 12(b), (e), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the

opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court

should freely give leave when justice so requires." *Id.* The district court has broad discretion to

decide a motion to amend. *See Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien

Hotel*, 145 F.3d 85, 89 (2d Cir. 1998).

Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or]

futility of amendment[.]" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Lucente v. Int'l

Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (noting that leave to amend may be

denied when amendment is "unlikely to be productive," such as when an amendment is "futile"

and "could not withstand a motion to dismiss [under] Fed. R. Civ. P. 12(b)(6)"). "[A] motion for

leave to amend a complaint may be denied when amendment would be futile." *Tocker v. Phillip*

*Morris Cos., Inc.*, 470 F.3d 481, 491 (2d Cir. 2006) (citing *Ellis v. Chao*, 336 F.3d 114, 127 (2d

Cir. 2003)); *see also Kim v. Kimm*, 884 F.3d 98, 105–06 ("Therefore, because the proposed

amendments would have no impact on the basis for the district court's dismissal and would

consequently be futile, the district court did not abuse its discretion in denying [the plaintiff]

leave to amend." (citing *Ellis*, 336 F.3d at 127)).

The Plaintiffs have already amended their Complaint once as a matter of course. *See*

Amd. Compl.; Fed. R. Civ. P. 15(a)(1) ("A party may amend its pleading once as a matter of

course. . ."). While it is in a court's discretion to grant further leave to amend, Fed. R. Civ. P.

15(a)(2) ("In all other cases, a party may amend its pleading only with the opposing party's

written consent or the court's leave."), a court can also deny leave to amend when it is "unlikely

to be productive" such as when an amendment is "futile" and "could not withstand a motion to

dismiss [under] Fed. R. Civ. P. 12(b)(6)," *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243,

258 (2d Cir. 2002).

Plaintiffs' claims are not viable under their theories of relief and the claims are

nevertheless time barred, thus leave to amend on those claims would be futile. *See, e.g.*, *Skibitcky*

*v. Healthbridge Mgmt., LLC*, No. 3:16-CV-00052-VLB, 2017 WL 4127899, at *9 (D. Conn.

Sept. 18, 2017) ("Leave to amend is futile here because Skibitcky would not be able to assert a

viable claim against West River. Defendant has correctly identified that the two-year statute of

limitations under 29 U.S.C. § 2617(c)(1) precludes an action against West River, given Skibitcky

received notice of her termination on April 1, 2014, and did not seek to add West River until

June 5, 2017.") (citing *Doe v. Whidden*, 557 Fed. App'x. 71, 73-74 (2d Cir. 2014) (identifying no

error on the district court's part in denying leave to amend as futile in part because "the statute of

limitations would have run with respect to the added party")); *see also Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 111 (2d Cir. 2023) (finding that the district court did not err in denying leave to amend where "an amendment would not cure the fact that [the Plaintiff's] claims are time barred").

Accordingly, the claims will be dismissed with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, and because all of the Plaintiffs' claims are time-barred, the Complaint is **DISMISSED**, and Defendant's motion to dismiss is **GRANTED**.

This case and the underlying claims are **DISMISSED** with prejudice.

The Clerk of Court is respectfully directed to enter judgment for the Defendant, Travelers Property Casualty Insurance Company, and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 15th day of August, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE